UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LISA CALLAN,                          )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        Case No. 4:12CV714 HEA
                                      )
ASCENSION HEALTH LONG-TERM            )
DISABILITY PLAN,                      )
                                      )
        Defendant,                    )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary

Judgment, [Doc. No. 32], and Plaintiff's Cross Motion for Summary Judgment to

Reverse Defendant's Arbitrary and Capricious ERISA Determination and Grant

Long Term Disability Benefits, [Doc. No. 35].  The matter is fully briefed.  For the

reasons set forth below, Defendant's Motion is granted, and Plaintiff's Motion is

denied.

### Introduction

Plaintiff seeks to recover benefits pursuant to Section 502(a)(1)(B) of the

Employee Retirement Income Security Act of 1974 (ERISA) , under the long term

disability plan of her employer.  Defendant's Claims Administrator denied

Plaintiff's application for long-term disability benefits.  Plaintiff appealed the

decision.  The Claims Administrator's decision was affirmed.  Plaintiff now seeks review of the denial.

## Findings of Fact[1]

Ascension Health sponsors the self-funded LTD Plan for the benefit of eligible employees of Borgess Health in Kalamazoo, Michigan, which includes Borgess Medical Center.  The Plan is an employee welfare benefit plan governed by the Employee Retirement Income Security Act. The Plan administrator and sponsor is Ascension Health. The Plan provides that the administrator "shall have the discretionary authority to decide all questions arising in connection with the administration, interpretation and application of the Plan."   The  Plan gives Ascension Health the power to delegate its authority to other administrators.

In accordance with the terms of the Plan, Ascension Health has delegated the discretionary authority with regard to claims administration to Sedgwick Claims Management Services, Inc. ("Sedgwick"), the Claims Administrator.  In this regard, the Plan provides:

Discretionary Authority

---

[1] Defendant has filed a Statement of Uncontroverted Facts.  Plaintiff, in contravention of this Court's Local Rule 7-4.01(E), failed to specifically controvert any of Defendant's facts. Likewise, Plaintiff failed to present her own Statement of Uncontroverted Facts.  Accordingly, Defendant's Statement of Uncontroverted Facts is taken as admitted by Plaintiff.

In carrying out their respective responsibilities under the Plan, the Plan administrator and the claims administrator shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.

The Plan defines "Disability/Disabled" in relevant part as follows:

***Disability/Disabled*** You are considered to be Disabled or to have a Disability if due to an Injury or Sickness that is supported by objective medical evidence, you require and are receiving the regular care and attendance of a Licensed Physician and you are following the course of treatment recommended by the Licensed Physician. In addition, one of the following is true:

> ● You are unable to perform during the first 24 months of benefit payments, or eligibility for benefit payments, each of the Material Duties of your Regular Occupation, and after the first 24 months of benefit payments, any work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings …

The term "Regular Occupation" is defined as follows:

***Regular Occupation*** The activities that you regularly performed when your Disability began. In addition to the specific position or job you hold with your Employer, it also includes other positions and jobs for which you have training and/or education to perform in your profession at your Employer or any other employer. (AR 62).

Therefore, during the first 24 months of receipt of LTD benefit payments, a

Plan participant must be unable to perform the activities that she regularly

performed when her disability began, with either her own employer or any other

employer, whether in the same job capacity or another for which the Participant

has training and/or education.

Plaintiff was 46 years old at the time of the filing of the Complaint. She was employed as a Clinical Documentation Specialist at Borgess Medical Center. In this capacity, she was responsible for facilitating modifications to clinical documentation, ensuring the accuracy and completeness of clinical information, and educating members of the patient care team accordingly. Plaintiff's last day of work was April 29, 2010.

Plaintiff's Basic Monthly Earnings on her last day of work were $5,418.49. At this time, her Monthly long-term disability ("LTD") benefit was $3,251.09, which was 60% of her Basic Monthly Earnings.

Plaintiff filed a claim for LTD benefits on or about June 16, 2010, claiming that she became disabled on or about April 30, 2010 due to chronic hydrocephalus, severe headaches, and nausea. On June 17, 2010, Sedgwick acknowledged Callan's claim for LTD benefits.

Plaintiff signed an authorization allowing Sedgwick to obtain copies of her relevant medical records on June 20, 2010. Following receipt of this authorization, Sedgwick began to solicit medical records from Plaintiff's treating physician, Dr. Stacey Watson ("Dr. Watson").

On July 14, 2010, Sedgwick had still not received the requested medical

records from Dr. Watson. Consequently, Sedgwick sent correspondence to Callan on July 14, 2010, informing her that it would be forced to preliminarily deny her LTD claim if records were not received from Dr. Watson by July 28, 2010.

On July 19, 2010, Sedgwick received an Attending Physician Statement from Dr. Watson, diagnosing Plaintiff with chronic hydrocephalus and chronic headaches. Dr. Watson opined that Callan was disabled from her occupation and noted that her return to work date was unknown. However, she further stated that Callan could sit, complete gross handling, and complete fine fingering for up to 6 hour periods in a normal workday.

Dr. Watson also submitted progress notes with her July 19, 2010 Attending Physician Statement, observing that Callan previously had missed only one or two days of work per month as a result of her condition. She further noted that treating physician Dr. Dirrenberger had performed a lumbar puncture procedure on Plaintiff, and had observed that her opening pressure was normal. Sedgwick solicited medical records from treating physician Richard Dirrenberger, M.D. ("Dr. Dirrenberger") on July 20, 2010.

On July 21, 2010, Sedgwick initially approved Callan's claim and provided LTD benefits to Callan from July 29, 2010 onward, pursuant to the LTD Plan's 90-day waiting period. Following this initial approval, Dr. Dirrenberger submitted an Attending Physician Statement for Plaintiff on August 3, 2010. Dr.

Dirrenberger diagnosed Plaintiff with hydrocephalus, but noted that she was not totally disabled from her occupation. In addition, the medical records Dr. Dirrenberger provided noted that the VP (ventricular) shunt, which had been implanted in Plaintiff's brain to treat her hydrocephalus, was functioning normally. Dr. Dirrenberger further observed that CT scans did not reveal any evidence of CSF subependymal absorption, and the spinal tap referenced in Dr. Watson's progress notes revealed that Plaintiff's intracranial pressure was normal.

After receiving these records from Dr. Dirrenberger, Sedgwick requested updated records from Dr. Watson on September 27, 2010 and October 18, 2010. However, no updated records were provided. Sedgwick sent correspondence to Plaintiff on November 5, 2010, informing her that it would be forced to deny her LTD claim if records were not received from Dr. Watson by November 19, 2010.

On December 6, 2010, Sedgwick was advised that the Social Security Administration had denied Plaintiff's claim for disability benefits on December 3, 2010.

As of this date, Sedgwick had still not received updated records from Dr. Watson. Sedgwick once again requested medical records from Dr. Watson on December 17, 2010. Dr. Watson provided Sedgwick with a Disability Update on December 21, 2010, again opining that Plaintiff remained totally disabled due to her hydrocephalus and daily debilitating head pain. However, Dr. Watson did not

provide or cite to any medical testing or functional examination to support this conclusion. Rather, she generally set forth various physical activity limitations she believed Plaintiff to have.

On February 2, 2011 and February 17, 2011, Sedgwick requested updated medical records from Dr. Watson's office for the period of January 2011 through the present. When updated records were not provided, Sedgwick was once again forced to request such records from Plaintiff on February 17, 2011. On February 18, 2011, Dr. Watson provided Sedgwick with another Disability Update, stating that Plaintiff remained disabled and opining that she would not return to work. However, as of this date, Dr. Watson had provided little to no information about the specific job duties that Callan was restricted from performing. Consequently, on May 13, 2011, Sedgwick requested that Plaintiff complete a Daily Activities Questionnaire, designed to obtain additional information about the tasks she could and could not perform.

Sedgwick also requested updated medical records from Dr. Watson on June 2, 2011. Dr. Watson submitted a Disability Update to Sedgwick on June 3, 2011, stating that she had not seen Plaintiff since February 14, 2011, and generally referring Sedgwick to her prior Disability Update.

On June 23, 2011, Plaintiff returned a completed copy of the Daily Activities Questionnaire Sedgwick had previously sent to her. Plaintiff stated that

she was able to perform all personal care independently. She further stated that she could prepare meals, shop, do household chores such as vacuuming, dusting, laundry, and mopping, walk around her backyard, and drive independently, with the proviso that such activities were not performed on days when she did not feel well – which occurred approximately five (5) days per month.

Sedgwick also requested updated medical records from Dr. Watson on June 17, 2011. When updated records had not been provided, Sedgwick sent follow-up correspondence to Plaintiff on July 13, 2011 informing her that additional records were needed from Dr. Watson to fully evaluate her LTD claim.

On July 14, 2011, Dr. Watson once again sent a general Disability Update, indicating that nothing had changed from her last update, but stating that Plaintiff had visited her on June 6, 2011. Progress notes from this visit indicated that Plaintiff was experiencing a little bit of dizziness and her head felt full, but did not provide any opinion as to specific job duties Plaintiff was restricted from performing. Dr. Watson also observed that Plaintiff had reported a little bit of numbness in her right elbow, but noted that no other numbness, weakness, or tingling was observed and no synovitis, swelling, or erythema of the joints of the hands, wrists or elbows was noted.

On July 18, 2011, the Social Security Administration (SSA) awarded disability benefits to Plaintiff beginning April 29, 2010. Pursuant to the terms of

the LTD Plan, Sedgwick informed Plaintiff on August 9, 2011 that her new LTD benefit amount, offsetting the monthly award from the SSA, would be $1,452.09.

Sedgwick subsequently referred Plaintiff's claim to Network Medical Review Co., which remitted Plaintiff's medical records to independent specialist advisor Dr. Arousiak Varpetian ("Dr. Varpetian") for review. On August 19, 2011, Dr. Varpetian, who is Board Certified in Internal Medicine and Neurology, issued findings based on his review of Callan's medical records. In connection with this review, Dr. Varpetian attempted to speak with Dr. Dirrenberger and Dr. Watson on multiple occasions, but was unable to reach them. Based on his review of Plaintiff's medical records and the Daily Activities Questionnaire Plaintiff provided, Dr. Varpetian concluded that there was no objective information that supported the conclusion that Plaintiff was unable to work. Dr. Varpetian acknowledged that the medical records indicated that Plaintiff had been diagnosed with hydrocephalus. However, he noted that the same records demonstrated that the VP shunt used to treat this condition had been checked by Plaintiff's neurosurgeon in various studies, such as a ventriculogram and a lumbar puncture. He observed that these studies revealed that the shunt was working normally and Plaintiff's CSF pressure was normal. Based on these studies and the notes of Plaintiff's Neurosurgeon, Dr. Dirrenberger, Dr. Varpetian concluded that Plaintiff's hydrocephalus had been appropriately treated, and did not seem to be

contributing to her headaches. Dr. Varpetian further noted that Plaintiff had complained of ongoing headaches. However, he concluded that the medical records did not demonstrate that the headaches interfered with her ability to work at her job or caused any neurological impairment. In support of this conclusion, Dr. Varpetian noted that Plaintiff had been participating in her regular routine activity, and that there were no restrictions or limitations indicated neurologically for Plaintiff's condition. He concluded that, while Plaintiff had subjective complaints of ongoing headaches, there was no neurological indication for any disability and no indication that Plaintiff was unable to perform her job as of September 1, 2011.

Based upon Dr. Varpetian's independent review, as well as a complete review of the claims file by Sedgwick's nurse case manager M. Vargo, Sedgwick notified Plaintiff on September 15, 2011 that she no longer qualified for long-term disability benefits. As explained in the letter, Plaintiff did not meet the LTD Plan's definition of disability beyond September 1,2011, which required her to be "unable to perform each of the Material Duties of [her] Regular Occupation."

Sedgwick also advised Plaintiff of her right to appeal the determination within 180 days, and provided an appeal packet of information.

Plaintiff appealed the denial of additional LTD benefits on September 28, 2011. In support of her appeal, Plaintiff provided a list of her treating physicians:

Dr. Watson, primary care physician; Dr. Dirrenberger, Neurosurgeon; and Dr. Moorman, Rheumatologist.

Plaintiff subsequently submitted a letter in connection with her appeal, dated October 13, 2011, stating that she did not think she could be an effective member of her organization because she was not able to function at 100% due to her condition, and further stating that her headaches had not changed.

Plaintiff also submitted additional progress notes from Dr. Watson, dated September 28, 2011, noting that while Plaintiff experienced daily headaches, severe headaches occurred only every couple of weeks. Dr. Watson further noted that Plaintiff had seen a Rheumatologist to address pain she had experienced in her ankles, feet, hips, and shoulders.

Finally, Plaintiff submitted a rheumatology evaluation in connection with her appeal, completed by Haydown A. Moorman, M.D. ("Dr. Moorman") on September 9, 2011. In connection with this evaluation, Dr. Moorman rendered no opinion as to whether Plaintiff could perform the functions of her occupation. Rather, he noted that Plaintiff's Neurologic impressions were "grossly within normal limits including cranial nerves, motor, and cerebellar function." Regarding Musculoskeletal impressions, Dr. Moorman observed that, although Plaintiff experienced some pain or tenderness in certain areas and had mild osteoarthritis, she had normal range of motion in her cervical spine, thoracic and lumbosacral

region, shoulders, hips, knees, ankles, and feet. Dr. Moorman further observed that Plaintiff had no history suggestive of tissue disease or physical findings that support a diagnosis of connective tissue disease.

Sedgwick referred Plaintiff's appeal to Network Medical Review Co., which remitted Plaintiff's medical records to two independent specialist advisors for review: Dr. Charles Brock and Dr. Dennis Payne. On November 4, 2011, Charles Brock, M.D. ("Dr. Brock"), who is Board Certified in Neurology and Pain Management, issued findings based on his review of the medical records, Plaintiff's job description, and the claims file. Dr. Brock attempted to contact Dr. Watson and Dr. Dirrenberger, but was unable to reach them despite leaving two separate voicemail messages for each physician. Based on his review of the claims file, Dr. Brock concluded that, from a neurology perspective, the available medical records did not support a finding that Plaintiff was disabled.

Specifically, Dr. Brock observed that Plaintiff's medical records described a history of chronic headaches, but did not describe a severity that is consistent with an inability to carry out her regular job duties. Dr. Brock also explained that the headache description provided in Plaintiff's medical records "indicate severe headaches only occasionally during the month and again does not demonstrate ongoing subjective symptomatology with associated severity or side effects related to medication in support of restriction of the patient from [a] neurological

perspective." He further explained that while the medical records indicated a condition of hydrocephalus, it was treated and did not demonstrate any abnormal neurologic findings or other ongoing condition that would support an inability to carry out her regular job duties.

On November 4, 2011, D. Dennis Payne, Jr., M.D. ("Dr. Payne"), Board Certified in Internal Medicine and Rheumatology, also issued findings based on his review of the medical records, Plaintiff's job description, and the claims file. Dr. Payne also attempted to contact Dr. Watson but was unable to reach her. However, Dr. Payne did speak with Dr. Moorman on November 3, 2011. Dr. Moorman confirmed his prior diagnosis of mild osteoarthritis, but reiterated that Plaintiff did not suffer from any inflammatory disease. Based on his review of Plaintiff's medical records, her job description, and the claims file, as well as his conversation with her Rheumatologist, Dr. Moorman, Dr. Payne concluded that Plaintiff was not disabled from performing her regular occupation as of September 1, 2011

Dr. Brock explained that the clinical findings in the medical record "were minimal from a rheumatology perspective." Specifically, there was "no description of any frank inflammatory features and no evidence of significant degenerative disease that would be producing restrictions or limitations on activities." Further, although there was mention of pain, the workup data and imaging studies

performed were normal and did not support any evidence of musculoskeletal findings that would be restricting or limiting. Dr. Brock therefore concluded that the clinical findings from a rheumatology viewpoint did not support a finding of disability.

On November 11, 2011, Sedgwick notified Plaintiff that based upon its medical file review and the independent reviews of Drs. Brock and Payne, Sedgwick had determined that Plaintiff was not eligible for additional LTD benefits as of September 1, 2011 because she did not meet the Plan's definition of Disabled, and denied her appeal.

Plaintiff subsequently filed this lawsuit on March 23, 2012.

## Discussion

**Standard of Review**

In *Metropolitan Life Insurance Co. v. Glenn,* 128 S.Ct. 2343, 2347-48 (2008), the Supreme Court acknowledged that in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111-13 (1998), the Court set out four principles as to the appropriate standard of judicial review under ERISA, § 1132(a)(1)(B), as follows: (1) A court should be "guided by principles of trust law," analogizing a plan administrator to a trustee and considering a benefit determination a fiduciary act, *id.,* at 111-113, 109 S.Ct. 948; (2) trust law principles require de novo review unless a benefits plan provides otherwise, *id.,* at 115, 109 S.Ct. 948; (3) where the

plan so provides, by granting "the administrator or fiduciary discretionary authority to determine eligibility," "a deferential standard of review [is] appropriate," *id.,* at 111, 115, 109 S.Ct. 948; and (4) if the administrator or fiduciary having discretion "is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion,' " *id.,* at 115, 109 S.Ct. 948. There is no dispute that the plan gives Defendant the discretionary authority to determine Plaintiff's eligibility for long-term disability benefits. Thus the standard of review in this matter is for an abuse of discretion, thus, only if the Defendant's decision was arbitrary and capricious will the decision be overturned.

Plaintiff argues that Defendant abused its discretion in failing to give a full and fair review of Plaintiff's claim. She argues that the determination of her treating physician was not given the proper consideration. However, a plan administrator is not required to give more deference to a treating physician's opinion over the reviewing doctor's opinion. *Weidner v. Federal Express Corp*., 492 F.3d 925, 930 (8th Cir. 2007); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *Cagle v. Unum Life Ins. Co. of America*, 2009 WL 995544 (E.D. Mo. 2009).

The record establishes that Defendant considered all of the evidence presented in support of Plaintiff's claim. It is undisputed that Plaintiff's

hydrocephalus was under control and the shunt in her brain was working normally. The level of fluid was within normal range as well. Dr. Dirrenberger, one of Plaintiff's treating physicians determined that Plaintiff was not disabled.

Although Plaintiff claimed that she misses work and cannot sit an entire day, Plaintiff is able to carry on normal daily activities such as cooking, vacuuming, walking in her yard, driving, shopping, etc.

Defendant's hired consultants, reviewed Plaintiff's medical records and attempted to, and did consult with Plaintiff's treating physicians. They determined that although Plaintiff had limitations, she was not disabled from her job.

Under an abuse of discretion standard, the decision of the Plan Administrator will not be disturbed if it is "reasonable." Reasonableness is measured by whether substantial evidence exists to support the conclusion. *Wakkinen v. Unum Life Insurance Co. of America*, 531 F.3d 575, 583 (8th Cir. 2008).

The Administrative Record clearly shows that Defendant considered all of the medical evidence and opinions offered by Plaintiff and by its consulting physicians.

Plaintiff urges reversal of the denial based on the Social Security award of permanent disability. Defendant considered the Social Security award, however, under the terms of the Policy, Defendant was not required to rely soley on this

determination. Generally, a plan administrator is not bound by a Social Security

Administration determination that a plan participant is disabled. *Rutledge v.*

*Liberty Life Assur. Co.*, 481 F.3d 655, 660-61 (8th Cir. 2007).

## Conclusions of Law

Based upon the foregoing analysis, the Court concludes the following

conclusions of law:

Defendant's decision to deny Plaintiff's claim for long term disability under

the Plan was not an abuse its discretion.

The decision to deny Plaintiff's claim for long term disability benefits under

the Plan at issue was reasonable.

Because Defendant's denial of Plaintiff's claim was not an abuse of

discretion, the decision is affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary

Judgment, [Doc. No. 32], is granted

**IT IS FURTHER ORDERED** that Plaintiff's Cross Motion for Summary

Judgment, [Doc. No. 35], is denied.

**IT IS FURTHER ORDERED** that the decision of Defendant to deny

Plaintiff's claim for long term disability benefits under the Plan herein is affirmed.

A separate judgment in accordance with this Opinion, Memorandum and

Order is entered this same date.

Dated this 5th day of February, 2014.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE